IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NEIL C. BOBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-848 |
| | ) |
| THE PNC BANK CORP. AND | ) |
| AFFILIATES LONG TERM | ) |
| DISABILITY PLAN, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

**INTRODUCTION**

In this civil action, Plaintiff, Neil C. Boby, asserts a
claim against Defendant, The PNC Bank Corp. and Affiliates Long
Term Disability Plan ("the Plan"), under Section 502 of the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. § 1132. Plaintiff's claim arises out the Plan's denial
of his claim for long-term disability ("LTD") benefits.
Pursuant to Fed.R.Civ.P. 56, the Plan has filed a motion for
summary judgment. For the reasons set forth below, the motion
will be granted.

**UNDISPUTED FACTS**

For purposes of the present motion, the following facts are undisputed:

The Plan, which is an employee welfare benefit plan governed by ERISA, provides LTD benefits to full-time, salaried employees of PNC Bank Corp. ("PNC") who are absent from work for more than 90 consecutive days because of injury or sickness. The Plan is fully self-funded. Benefits under the Plan are paid out of a separate trust known as the Group Benefits Trust, which was pre-established by an actuary for that purpose. PNC has no residual interest in the trust. All trust funds must be used exclusively for the benefit of participants in, and beneficiaries of, the Plan. (Docket No. 29, ¶¶ 2-3, Exh. 1, AR 274-310, 311-12,[1] Docket No. 33, ¶¶ 2-3).[2]

PNC is identified as the Plan Administrator in Section II(16) of the Plan. The responsibilities of the Plan Administrator are set forth Section V(3) of the Plan which states:

\* \* \*

---

[1] "AR __" refers to the Bates number in the Administrative Record of Plaintiff's claim for LTD benefits which has been attached to the Plan's motion for summary judgment as Exhibit 1.

[2] Docket Nos. 29 and 33 are the Plan's Statement of Material Facts Not in Dispute and Plaintiff's response thereto, respectively.

3. PLAN ADMINISTRATOR

   a. The Administrator shall be responsible for the Plan's
   compliance with all the requirements of applicable
   provisions of [ERISA]. [PNC] shall be the Plan
   Administrator and the "named fiduciary" under ERISA. The
   Administrator shall be vested with all the power,
   authority and discretion necessary to supervise and
   control the operations of the Plan in accordance with the
   terms thereof. Such powers include, but not by way of
   limitation, the following:

      (1) To establish and enforce such rules, regulations
      and procedures as it shall deem necessary and proper
      for the efficient operation and administration of the
      Plan;
      (2) To interpret the Plan and the rules and
      regulations, including the supplying of any omissions
      in accordance with the intent of the Plan and its
      interpretation thereof in good faith;
      (3) To determine the eligibility and status of any
      Employee with respect to Plan participation;
      (4) To determine questions of fact, law and mixed
      questions of fact and law;
      (5) To compare and calculate for payment the amount of
      benefits payable to any person in accordance with the
      terms of the Plan; and
      (6) To appoint or employ individuals or firms to
      assist in the administration of the Plan and any other
      agent or agents it deems advisable.

   b. The Administrator shall have complete and sole
   discretion with regard to each of the powers listed in (1)-
   (6) above, and no decision of the Administrator shall be
   overturned unless the decision is arbitrary and capricious.

                         *   *   *

(Docket No. 29, ¶¶ 4-5, Exh. 1, AR 227-28, Docket No. 33, ¶¶ 4-
5).

     In December 2004, pursuant to Section V(3)(a)(6) of the

Plan, PNC entered into a Service Agreement with Sedgwick Claims

Management Services, Inc. ("Sedgwick"), pursuant to which PNC

delegated its discretionary authority to determine eligibility

for LTD benefits under the Plan to Sedgwick.  The Service

Agreement explicitly confers discretion on Sedgwick to evaluate

and decide claims and to review and resolve appeals of denied

claims.  Sedgwick does not receive any financial benefit from

the denial of claims.  As a result, Sedgwick has no financial

interest in the ultimate decisions concerning claims for LTD

benefits.  Sedgwick receives the same compensation for reviewing

claims for LTD benefits, irrespective of whether the claims are

granted or denied.  Similarly, independent medical experts who

review claims for LTD benefits under the Plan at Sedgwick's

request receive the same compensation, irrespective of the

opinions rendered.  (Docket No. 29, ¶¶ 6-8, Exh. 1, AR 246-73,

Docket No. 33, ¶¶ 6-8).

Under the Plan, "Total Disability" and "Totally Disabled"

mean that because of injury or sickness (a) [t]he Participant

cannot perform each of the material duties of his or her regular

occupation; and (b) [a]fter benefits have been paid for 24

months, the Participant cannot perform each of the material

duties of any gainful occupation for which he or she is

reasonably fitted by training, education or experience.  (Docket

No. 29, Exh. 1, AR 217).

With respect to notice of a claim for LTD benefits and the procedures applicable to claim review and a Plan participant's appeal of an adverse decision, Section V of the Plan states:

\*   \*   \*

5. NOTICE OF CLAIM

a. The Participant must notify his Benefits Department within 30 days of the date Total Disability starts, if that is possible. If that is not possible, the Benefits Department must be notified as soon as it is reasonably practicable to do so, but in any event no later than 120 days after the date Total Disability starts.

b. Upon notification by the Participant, the Benefits Department will forward to the Participant a claim form to be completed by the Participant and the Participant's Physician. The claim form should be completed by the Participant and the Participant's Physician within 60 days of the date Total Disability starts if that is possible, or if it is not possible, as soon as it is reasonably practicable to do so, but in any event no later than 180 days after the date Total Disability starts.

\*   \*   \*

7. ERISA CLAIMS AND APPEALS

a. Claim for Benefits. Any claim for benefits under the Plan must be filed with the Claims Administrator not later than 90 days following the date Total Disability begins. If a claim is wholly or partially denied by the Claims Administrator, written notice of such denial shall be sent to the claimant within 90 days ... after receipt of the claim. Such notice shall contain (1) the specific reason or reasons for the denial; (2) specific reference to the pertinent Plan provisions on which the denial is based; (3) a description of any additional material or information necessary for the claimant to perfect the claim, if applicable, and an explanation of why such material or information is necessary; and (4) an explanation of the Plan's claims review procedure.

b. Review Procedure. Within 60 days after receipt of a written notice of denial, the claimant may file with the Plan Administrator a written request for review of the denial. At the time a [request for] review is filed, the claimant or his duly authorized representative may submit issues and comments in writing and may review any

6

pertinent documents. Within 60 days ... after receipt of a request for review, the Plan Administrator shall render a written decision to the claimant, in language calculated to be understood by the claimant, containing the reasons for the decision and specific references to the pertinent Plan provision(s) on which the decision is based.

c. <u>Exhaustion of Remedies</u>. No legal action with respect to a claim for benefits under the Plan shall be instituted unless the claimant shall have first exhausted the claims and appeals procedures set forth in Sections 5 and 7 herein.

d. Notwithstanding the preceding, if a Participant fails to file a claim or request for review in the form and within the time frame specified herein, such claim or request shall be waived and the Participant will be forever barred from reasserting such claim.

* * *

(Docket No. 29, Exh. 1, AR 228-29).

Plan participants are subject to an "Elimination Period," which is defined in Section II of the Plan as follows:

* * *

5. "Elimination Period" means a period of consecutive days of Total Disability for which no benefit is payable. The Elimination Period is shown in the Plan Specifications and begins on the first day of Total Disability.[3] If during the

---

[3] With respect to the Elimination Period, the Plan Specifications set forth in Section I of the Plan provide:

* * *

7. ELIMINATION PERIOD:

The later of 90 days or, in the case of a Participant employed by the former Bank of Delaware or Central Bancorporation, the termination of short term disability payments or personal illness days. Notwithstanding the foregoing, effective January 1, 1994, the elimination period for all Participants is 90 days.

* * *

7

Elimination Period Total Disability stops for any 7 (or lower) calendar days, then the Total Disability will be treated as continuous. But days that the Participant is not Totally Disabled will not count toward the Elimination Period.

\*   \*   \*

(Docket No. 29, Exh. 1, AR 215).

At all times, it is the responsibility of the Plan participant to submit documentation establishing Total Disability. Once a Plan participant has provided proof that he or she is Totally Disabled, payment of LTD benefits will commence after the 90-day Elimination Period. (Docket No. 29, ¶ 14, Docket No. 33, ¶ 14).

Plaintiff was hired by PNC on May 20, 1996. (Docket No. 29, Exh. 1, AR 21). Plaintiff, who suffers from migraine headaches, held the position of a Reconcilement Reporting Analyst II ("RRA II"),[4] and he was a participant in the Plan. PNC accommodated Plaintiff's migraine headaches by providing him with an LCD flat screen computer monitor, and by allowing him to work a flexible schedule pursuant to which he only had to come to work when he did not have a migraine headache or when a migraine headache was "manageable." (Docket No. 29, ¶ 16, Exh. 1, AR 48, Docket No. 33, ¶ 16).

---

(Docket No. 29, Exh. 1, AR 214).

[4] An RRA II is considered a sedentary position because it requires only occasional carrying of items weighing up to 10 pounds and only 30 minutes of walking during an 8-hour workday. (Docket No. 29, Exh. 1, AR 48).

The last day Plaintiff reported to work at PNC was July 3, 2008. (Docket No. 29, ¶ 16, Docket No. 33, ¶ 16). Four days later, Plaintiff submitted a claim for short-term disability ("STD") benefits to PNC.[5] By Memorandum dated July 16, 2008, Laurie Ross, a PNC Case Manager, notified Plaintiff of the procedures applicable to claims for STD benefits. Among other things, Ms. Ross's Memorandum stated: "It is your responsibility to insure that the enclosed disability certificate is completed by you and your treating physician. **You must return it to my attention within 10 business days from the date of this memo. You may return your certificate via fax (412-768-5787) to insure its timely return or via mail (in the enclosed envelope).**" (emphasis in original) (Docket No. 29, ¶ 17, Exh. 2, p. 1, Docket No. 33, ¶ 17).[6]

---

[5] With respect to STD benefits, the Plan notes, and Plaintiff does not dispute, that "PNC provides eligible employees with two income protection programs: [STD] benefits; and (2) LTD benefits.... STD benefits are available to all full-time employees after six months of continuous full-time employment.... STD benefits constitute a payroll practice of PNC and are not subject to ERISA." (Docket No. 29, ¶ 17, n.5).

[6] In response to paragraph 17 of the Plan's Statement of Material Facts Not in Dispute, which sets forth facts regarding Plaintiff's claim for STD benefits and cites documents in Exhibit 2 attached thereto, Plaintiff admitted that he submitted a claim for STD benefits to PNC on July 7, 2008. However, Plaintiff objects to the remaining statements in paragraph 17 pertaining to the processing of his STD claim, as well as the documents on which the statements are based, because the STD claim "is not part of this litigation and the Plaintiff does not have a complete administrative record on the [STD] action...." (Docket No. 33, ¶ 17). With respect to Plaintiff's objections, the Court finds that his claim for STD benefits is relevant for purposes of the background of this litigation, and, because he has not challenged the authenticity or accuracy of any of the documents in Exhibit 2 to the Plan's Statement of Material Facts Not in Dispute, many of which involve communications between PNC and Plaintiff or his counsel, the documents are included in the Court's summary of the undisputed facts.

Plaintiff's Disability Certificate for his STD claim, which was dated August 25, 2008, was received by PNC on August 28, 2008.[7] Dr. Kenneth Gibson, Plaintiff's family physician, completed the Statement of Attending Physician in the Disability Certificate, indicating, in summary, that the first day Plaintiff became unable to work was July 7, 2008; Plaintiff's primary diagnosis was anxiety and his secondary diagnoses were migraine headaches and insomnia; the cause of Plaintiff's anxiety was non-work-related stress; the limitations that precluded Plaintiff from working included "anxiety, unable to concentrate, migraine headaches;" Plaintiff was treated with medication and follow-up office visits; and the length of Plaintiff's disability could not be predicted at that time.[8] (Docket No. 29, Exh. 2, p. 6).

---

[7] As noted previously, Ms. Ross's memorandum to Plaintiff on July 16, 2008 stated that the Disability Certificate was due 10 business days from the date of the memorandum or July 26, 2008. Exhibit 2 to the Plan's Statement of Material Facts Not in Dispute contains 2 notes by Ms. Ross to Plaintiff's STD file. The first note, dated August 4, 2008, indicates that Ms. Ross left a voice message for Plaintiff explaining that he had 5 days to return the paperwork for his STD claim or the claim would be suspended on August 7, 2008. (Docket No. 29, Exh. 2, p. 4). The second note, dated August 12, 2008, states that Ms. Ross left another voice message for Plaintiff indicating that she still had not received his STD paperwork and his STD claim was suspended as of that date. Ms. Ross concluded the second note as follows: "I also reminded him that if he turned in paperwork after today the STD could possibly be reinstated." (Docket No. 29, Exh. 2, p. 5). As discussed infra, PNC did, in fact, process Plaintiff's claim for STD benefits despite his failure to timely submit the Disability Certificate.
[8] In follow-up correspondence with Ms. Ross in late August or early September, 2008, Dr. Gibson indicated that he had seen Plaintiff on two occasions since the date on which Plaintiff's alleged disability began: July 15, 2008 and August 25, 2008. (Docket No. 29, Exh. 2, p. 7).

10

Ms. Ross forwarded Plaintiff's claim for STD benefits to Christine A. Marsh, an employee with PNC's Human Resource Services, for review of the supporting medical evidence which consisted of the notes of Plaintiff's office visits with Dr. Gibson on July 15, 2008 and August 25, 2008. Ms. Marsh performed the review on September 9, 2008. The next day, Ms. Marsh prepared a memorandum for purposes of "LTD Documentation" in which she summarized Dr. Gibson's July 15th and August 25th office notes;[9] noted she had reviewed Plaintiff's STD claim file the previous day and concluded "the decision to deny the claim remains;" and noted a voice message had been left for Plaintiff to call the morning of September 10th to discuss the medical

---

[9] With respect to Plaintiff's July 15th office visit with Dr. Gibson, Ms. Marsh noted that the reason listed for the visit was "return to work counseling;" the medications already prescribed for Plaintiff's chronic anxiety and migraine headaches were continued; Plaintiff's irritable bowel syndrome ("IBS") was described as resolved as of February 8, 2008; Plaintiff denied fevers, chills, recent upper respiratory symptoms, neck or chest pain, heart palpitations, shortness of breath, dyspnea on exertion, abdominal complaints, nausea, vomiting, excessive gas or bloating, heartburn, difficulty urinating or urinary tract symptoms, swelling of extremities, or pain in muscles or joints; and Plaintiff was described as "well appearing in no obvious distress."

As to Plaintiff's August 25th office visit with Dr. Gibson, Ms. Marsh noted that the listed reason for the visit was the "completion of forms;" Plaintiff's primary diagnosis was migraine headaches "w/o mention intractable;" Plaintiff reported continued intermittent panic attacks "most recently triggered by interactions w/upper mgmt due to his medical problems and his request for concessions because of his health problems;" Plaintiff denied chest pain, shortness of breath, and bowel or bladder symptoms; the review of Plaintiff's systems was otherwise unremarkable; Plaintiff was described as "well appearing in no obvious distress;" Plaintiff was continued on his medication regime for anxiety with resultant insomnia and migraine headaches; and he was instructed to return as needed. (Docket No. 29, Exh. 2, p. 8).

evidence provided by Dr. Gibson in support of his STD claim.[10]

(Docket No. 29, Exh. 2, p. 8).

On October 9, 2008, Plaintiff sent the following email to
Ms. Ross: "I have not received my [LTD] forms yet, it has been
over 90 days since my absence began. Please advise as to the
status of their delivery."[11]  In response to the email, Plaintiff
was notified that Ms. Ross was out of the office. Plaintiff
then sent an email to Ms. Marsh requesting information
concerning the "status of the LTD forms." Ms. Marsh responded
by email as follows:

> Your absence which began on 07/07/2008 was denied for [STD]
> Benefits because medical documentation received did not
> provide objective evidence to support disability.
> Therefore, the [LTD] process will not be initiated as we
> have not received objective medical evidence to support
> disability during the elimination period.[12]

---

[10] Apparently, Plaintiff did not return Ms. Marsh's call as requested.  (Docket
No. 29, Exh. 2, p. 9).

[11] The Plan asserts that Plaintiff's October 9th email was his first request for
an LTD application.  (Docket No. 30, p. 9).  Plaintiff disputes this
assertion, claiming that he requested an LTD application by telephone several
times prior to this email starting in August, 2008.  (Docket No. 33, ¶ 18).
In response, the Plan submitted an affidavit of Ms. Ross in which she avers:
"After a reasonable search of the information available to me, I cannot find
any record that [Plaintiff] contacted me at any time prior to October 9, 2008
to request an application for [LTD] benefits."  (Docket No. 36, Exh. 3).  In
light of the Court's conclusions regarding the Plan's motion for summary
judgment, this factual dispute is not material.

[12] As noted by the Plan, the 90-day elimination period relating to Plaintiff's
claim for LTD benefits expired on October 5, 2008 (90 days from Plaintiff's
alleged date of Total Disability of July 7, 2008).  (Docket No. 29, ¶ 18).
With respect to his failure to receive an application for LTD benefits from
PNC, Plaintiff asserts that PNC did not follow its own "established
procedure" of providing Plan participants with LTD applications after 50
consecutive days of absences from work.  (Docket No. 31, pp. 8-10).  In
support of this "established procedure," Plaintiff cites to a letter from PNC
that he received in connection with a prior absence from work for 50
consecutive days due to illness.  The letter dated February 11, 2008 was
attached to Plaintiff's response to a motion to dismiss filed by the Plan and
does, in fact, appear to support the alleged "established procedure."

12

At your request, I left you a voice mail on your home phone
on 09/09/2008 to discuss your STD claim determination. To
date, I have not received a response until today.

(Docket No. 29, Exh. 2, p. 9).

On October 31, 2008, Plaintiff's counsel sent a letter to

Ms. Ross indicating that he had been retained to represent

Plaintiff in connection with the denial of his claim for STD

benefits, and requesting all documentation relating to the

claim. Counsel also requested an application for LTD benefits,

despite Ms. Marsh's statement in her October 9th email that the

LTD process would not be initiated due to the lack of objective

medical evidence supporting Plaintiff's claim of Total

Disability during the Elimination Period. Noting Ms. Marsh's

reference to a lack of "objective medical evidence," counsel

asked Ms. Marsh to define "objective medical evidence" in the

context of a case involving a psychological disability.[13]

(Docket No. 29, Exh. 2, pp. 10-11).

---

(Docket No. 13, Exh. A, pp. 9-11). In response to this assertion, PNC
submitted the affidavit of Michael J. Braunstein, its Manager of Benefits
Planning and Administration, which contains the following averments: "5. If a
Participant has been out of work for at least fifty (50) consecutive days, he
or she does not automatically receive an LTD application. The participant
must also have been approved for STD benefits before the LTD application
process will begin. 6. As a general practice, if a Participant has been
approved for benefits under PNC's [STD] policy and remains out of work for
fifty (50) consecutive days, the Participant is provided with a[n] [LTD]
application so they can apply for LTD benefits under the Plan." (Docket No.
36, Exh. 4). For purposes of the present motion for summary judgment, this
dispute also is not material.

[13] As to the purported lack of objective medical evidence to support
Plaintiff's STD claim, counsel also stated: "... please point out in the plan
documents where objective medical evidence is required to support disability.
It is our position that given the current state of psychiatric medicine,
there is no objective medical evidence to support any psychological condition

13

Counsel's October 31st letter was referred to Elaine M. Crable, a PNC Benefits Manager, for response. By letter dated November 17, 2008, Ms. Crable summarized Dr. Gibson's notes relating to Plaintiff's office visits on July 15, 2008 and August 25, 2008 and indicated that this evidence did not support Plaintiff's claim for STD benefits based on an inability to work beginning July 7, 2008. Ms. Crable noted that STD benefits are provided to PNC employees through a salary continuation program that is not subject to ERISA, and that based on the documented intermittent nature of Plaintiff's anxiety condition, he may qualify for intermittent leave under the Family and Medical Leave Act. Finally, Ms. Crable invited counsel to submit any additional medical evidence that would support Plaintiff's claim for STD benefits beginning July 7, 2008. (Docket No. 29, Exh. 2, pp. 12-13).

On January 22, 2009, Plaintiff's counsel submitted to PNC the records of Douglas R. Ramm, Ph.D., a psychologist, relating to his treatment of Plaintiff "as proof of disability in regard to his [STD] Case ONLY." Counsel noted his belief that the enclosed records of Dr. Ramm, together with Dr. Gibson's records, "show overwhelming support for [Plaintiff]'s disability claim." Counsel concluded his letter as follows: "Based on the

let alone Mr. Boby's psychological condition. Therefore, you have set forth a (sic) illusory standard which cannot be met." (Docket No. 29, Exh. 2, p. 10).

14

content of these records we would demand that you immediately grant his [STD] claim and forward an application for [LTD] benefits." (Docket No. 29, Exh. 2, p. 14).

Again, counsel's letter was referred to Ms. Crable who responded on February 19, 2009. Ms. Crable summarized Dr. Ramm's progress notes from August 22, 2008 through December 3, 2008; reiterated her position that Plaintiff was not eligible for LTD benefits because there was no medical evidence establishing Total Disability during the 90-day Elimination Period; and invited counsel again to submit additional medical evidence to support Plaintiff's claim that he had been Totally Disabled since July 7, 2008. (Docket No. 29, Exh. 2, pp. 15-16).

Counsel responded to Ms. Crable's letter on March 17, 2009, objecting to certain statements in her February 19th letter; requesting Ms. Crable's qualifications to evaluate Plaintiff's medical records in connection with his STD claim; stating it was not clear whether a physician, nurse or any other qualified medical provider had evaluated Plaintiff's STD claim; and requesting the curriculum vitae of the person who had evaluated Plaintiff's STD claim. With regard to Plaintiff's prior requests for an application for LTD benefits, counsel stated: "You have failed to provide Mr. Bobby (sic) with an opportunity to file for [LTD] benefits. Please accept this letter as the

last opportunity to provide us with a formal application for [LTD] benefits.  If we do not receive a[n] [LTD] benefit application within 30 days so that a formal application can be filed, we will immediately file suit in the Federal District Court for the Western District of Pennsylvania or the Westmoreland County Court of Common Please (sic), whichever court we feel best suits this action, alleging that you have failed to provide us with said application and are in violation of [ERISA]."  (Docket No. 29, Exh. 2, pp. 17-18).

Ms. Crable responded to counsel's March 17th letter on March 30, 2009, stating in part:

\* \* \*

In my letter dated February 19, 2009, I noted the findings of Douglas R. Ram (sic), Ph.D. because that is the only information that you submitted in support of Mr. Boby's claim for disability, and the information did not support a disability based on anxiety and migraine.  To date, we have not received medical evidence from a licensed medical doctor(s) to support a continuously disabling condition, including evidence that Mr. Boby has been unable to perform the essential functions of his job since July 7, 2008.  It is noted that Dr. Ram (sic) is not a medical doctor.  Dr. Ram's (sic) progress notes for the period August 22, 2008 through December 3, 2008 do not state that Mr. Boby was referred to a medical doctor.

To date, you and your client have not submitted any medical evidence that supports Mr. Boby's claim of continuous disability related to his complaints of anxiety and migraine when his absence began on July 7, 2008.  Therefore, we have determined that Mr. Boby has not met the required period of elimination in order to qualify for long term disability benefits, and that is why a claim for LTD benefits has not been initiated.

16

In response to your request, I am enclosing an LTD claim
application that must be completed by Mr. Boby and his
treating medical physician (or psychiatrist). Please
return the completed/signed application to me via the
enclosed stamped, self-addressed envelope. In their review
of Mr. Boby's LTD application and any other additional
medical that they may request, Sedgwick CMS, PNC's third
party administrator for LTD benefits, will determine
whether or not Mr. Boby met the 90 consecutive-calendar day
period of elimination in order to qualify for LTD benefits
and subsequently render a claim decision. Following is
important information about LTD benefits that is normally
communicated to a claimant at the time the LTD application
is initiated.

\* \* \*

There is one additional note regarding your benefit status.
If you have satisfied the (90 consecutive calendar day)
period of elimination and have not returned to work, you
must apply for LTD benefits within 120 days of your
disability, ....[14]

\* \* \*

With regard to counsel's request in his March 17th letter for Ms.

Crable's qualifications, she signed the March 31st letter as

follows: "Elaine M. Crable, R.N., B.S.N.," indicating that she

holds a Bachelor of Science degree in nursing and is a

registered nurse. (Docket No. 29, Exh. 2, pp. 19-21).

---

[14] As noted previously, under the Plan, a participant must submit a completed
LTD claim form no later than 180 days after the date Total Disability begins,
not 120 days as stated by Ms. Crable in her March 30, 2009 letter to counsel.
(Docket No. 29, Exh. 1, AR 228). In any event, the 180-day period within
which Plaintiff was required to submit a completed LTD claim form expired on
January 3, 2009, almost 3 months before this letter was sent by Ms. Crable to
counsel. Thus, any LTD application filed by Plaintiff would have been
untimely under the Plan. Ms. Crable failed to mention this fact in her
letter.

17

Thereafter, an application for LTD benefits dated May 22, 2009 was submitted to PNC by Plaintiff.[15] The LTD application described the nature of Plaintiff's disability as "Anxiety, Migraines, IBS, Insomnia;" indicated that he was unable to perform the essential functions of his job as an RRA II due to "Severe anxiety, Inability to concentrate, Insomnia, migraine headaches, abdominal pains, social interaction problems;" identified his treating sources as Dr. Gibson, family physician since March 2005, and Douglas Ramm, Ph.D., psychologist since August 2008; indicated that his doctor(s) restricted his activities as follows: "No work, rest;" noted that he was able to leave home without help; and described the limitations on his home duties, social activities and activities of daily living as follows: "insomnia, unable to concentrate, unable to relax, social activities with friends more limited, household cleaning more limited." (Docket No. 29, Exh. 1, AR 27-29).

---

[15] The parties disagree on the date Plaintiff submitted his claim for LTD benefits. Plaintiff maintains he sent the LTD application to PNC through the United States Postal Service following its completion on May 22, 2009, while PNC contends it did not receive Plaintiff's LTD application dated May 22, 2009 until November 9, 2009. PNC further contends that "out of an abundance of caution, PNC asked Sedgwick to review and make an independent determination with respect to Plaintiff's LTD Application, even though it was untimely and Plaintiff failed to establish even an entitlement to STD benefits during the Elimination Period." (Docket No. 29, ¶ 20, Docket No. 33, ¶ 20). The parties' dispute concerning the date Plaintiff's LTD application was submitted for processing is immaterial. As noted in footnote 14, the period within which Plaintiff was required to file his LTD application under the Plan expired on January 3, 2009 (180 days from the alleged date of Total Disability), and the date Plaintiff contends he submitted an LTD application was more than 4 months after this date.

18

With his application for LTD benefits, Plaintiff submitted

a Treating Physician's Statement completed by Dr. Gibson on May

18, 2009. Dr. Gibson noted Plaintiff's subjective complaints

(anxiety, migraine headaches, IBS and insomnia);[16] his objective

findings (anxious mood); the complications from Plaintiff's

diagnoses (migraine - missed work, IBS - poor social

interaction); the persistence of Plaintiff's diagnoses (ongoing

for years); the frequency of his treatment of Plaintiff (every 2

to 3 months); Plaintiff's prescribed medications; his referral

of Plaintiff to Dr. Ramm, the psychologist; the restrictions

preventing Plaintiff from performing the essential functions of

his job (overwhelming anxiety, migraine headaches, insomnia and

IBS);[17] and Plaintiff's prognosis (guarded). (Docket No. 29,

¶ 22, Exh. 1, AR 33-35, Docket No. 33, ¶ 22).

---

[16] The Court notes that IBS was not among the diagnoses listed by Dr. Gibson in
the Disability Certificate submitted in support of Plaintiff's STD claim in
August 2008.
[17] The job of an RRA II has five essential functions which have been described
as follows:

\*   \*   \*

**Essential Functions - Critical Elements of the Job**

**Essential Function #1:**
40% - Monitors and evaluates daily, weekly and monthly reconcilement
reports, monthly aging reports, and the distribution of these month-end
reports to management. Ensures that all exception items fall within
service level parameters and clearance parameters (aged items), and
researches all large dollar variances. Represents the reporting
manager in the manager's absence, and assists the manager in team
member training. The monitoring of exception items is completed in an
effort to minimize the risk of financial loss to the corporation.

By letter dated November 10, 2009, Sedgwick acknowledged

receipt of Plaintiff's LTD application and the beginning of its

review process to determine his eligibility for LTD benefits.

(Docket No. 29, ¶ 23, Exh. 1, AR 36-37, Docket No. 33, ¶ 23).

The next day, Sedgwick sent letters to Drs. Gibson and Ramm

requesting updated information by November 21, 2009, with regard

---

**Essential Function #2**:
20% - Assures quality control of all reconcilement, aging and financial
reporting, and the accurate and timely distribution of all financial
schedules and reporting spreadsheets. Ensures that all departmental
service levels are maintained and achieved. Makes on-going
recommendations to management regarding the control of financial risk.
The quality control and risk exposure functions are completed in an
effort to minimize exposure and financial risk to the corporation.

**Essential Function #3**:
20% - Reviews and approves the Reconcilement Oversight Department (ROD)
Lotus Notes database entries for general ledger aged items (60 days and
over). Responsible for ensuring that all aged items are ultimately
reconciled, and that all active cost centers appear in the database on
a monthly basis. Prepares and reviews ad hoc reports as requested for
internal projects and corporate initiatives. Managing the ROD database
is completed in an effort to minimize risk of financial loss to the
corporation.

**Essential Function #4**:
10% - Works as a project leader on various assigned departmental and
corporate initiatives. May be asked to participate in the Process
Improvement Team, and as such will make ongoing recommendations for
modifications and improvements to current processes. Project
management involvement is done in an effort to maximize efficiencies as
they relate to processed and procedures within the department and with
other related functional areas.

**Essential Function #5**:
10% - Monitors the Bank Operations Notification of Exceptions (BONE)
Lotus Notes database system for general ledger and internal demand
deposit account exception items. Provides written notification to
appropriate branches and/or other functional areas of open items that
exceed clearance parameters, and assists branches and/or other
functional areas in the resolution and clearing of these exception
items. Managing the BONE database ensures the integrity and accuracy
of the corporation's financial data.

\* \* \*

(Docket No. 29, ¶ 15, Exh. 1, AR 49-50, Docket No. 33, ¶ 15).

to Plaintiff's conditions, including treatment records, consultative reports, and diagnostic test results since July 7, 2008. In addition, the letter requested responses to specific questions regarding (a) Plaintiff's disabling conditions; (b) restrictions/limitations preventing Plaintiff from working on either a full-time or part-time basis; (c) Plaintiff's course of treatment and frequency of treatment; and (d) Plaintiff's prognosis.[18]  (Docket No. 29, ¶ 24, Exh. 1, AR 41-45, Docket No. 33, ¶ 24).

On November 20, 2009, Dr. Gibson responded to Sedgwick's specific questions regarding Plaintiff's medical conditions, stating: (1) Plaintiff's primary diagnosis is anxiety disorder and his secondary diagnoses are migraine headaches, depression, insomnia and IBS; (2) Plaintiff is restricted or limited from performing full or part-time work due to "difficulty concentrating and relaxing, unable to follow directions and complete tasks;" (3) Plaintiff's treatment included medications and psychotherapy; (4) he had last seen Plaintiff on November 20, 2009, the day of his response to Sedgwick's questions; and (5) Plaintiff's prognosis was "guarded." (Docket No. 29, ¶ 26, Exh. 1, AR 54, Docket No. 33, ¶ 26).

---

[18] On November 11, 2009, Sedgwick also wrote to Plaintiff's counsel, requesting him to contact Drs. Gibson and Ramm "to facilitate prompt submission of the requested information within the time allotted." (Docket No. 29, ¶ 25, Exh. 1, AR 40, Docket No. 33, ¶ 25).

Thereafter, on November 23, 2009, Dr. Gibson provided Sedgwick with the records of Plaintiff's seven office visits between July 15, 2008 and October 8, 2009, together with the reports of various lab tests and an ultrasound of Plaintiff's abdomen on March 27, 2009.[19] (Docket No. 29, ¶ 30, Exh. 1, AR 79-121, Docket No. 33, ¶ 30).

Also on November 23, 2009, Dr. Ramm responded to Sedgwick's request for responses to specific questions regarding Plaintiff's conditions.[20] Dr. Ramm described Plaintiff's diagnoses as follows:

```
AXIS I      300.0    Anxiety Disorder, Not Otherwise Specified
            296.23   Depressive Disorder, Single Episode,
                     Moderate Severity
AXIS II     V71.09   No Condition
AXIS III             Migraine Headaches and Irritable Bowel
                     Syndrome
AXIS IV              Stress Related to Employment
AXIS V               GAF - 50[21]
```

---

[19] Plaintiff's abdominal ultrasound was normal. (Docket No. 29, Exh. 1, AR 120-21).

[20] Dr. Ramm enclosed the following documents with his letter: (1) a largely illegible copy of the report of Plaintiff's initial psychological evaluation on August 22, 2008; and (2) a Case Management Report which included brief progress notes for sessions on August 28 2008, September 4, 12, 18 & 24, 2008, October 2, 6 & 22, 2008, November 18, 2008, December 3 & 11, 2008, January 2, 8 & 15, 2009, February 13 & 24, 2009, March 4, 2009, April 4, 14 & 23, 2009, May 5 & 23, 2009, June 2 & 16, 2009, July 7 & 21, 2009, August 4 & 25, 2009, September 8 & 29, 2009 and November 3 & 11, 2009. (Docket No. 29, Exh. 1, AR 65-74).

[21] The Global Assessment of Functioning, or GAF, scale is used by clinicians to report an individual's overall level of functioning. The scale does not evaluate impairments caused by physical or environmental factors. The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness. The highest possible score is 100, and the lowest is 1. A score between 41 and 50 on the GAF scale denotes: **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). American Psychiatric Association: Diagnostic and Statistical Manual

According to Dr. Ramm, Plaintiff displayed a number of symptoms that prevented him from maintaining gainful employment at that time, including "apprehensive expectations, mild panic attacks, nightmares pertaining to incidents which occurred while he was on the job, and general irritability." Dr. Ramm further noted that Plaintiff's symptoms included a depressed mood on a daily basis, "markedly" diminished pleasure in all, or almost all, activities of daily living, a 10-pound weight loss over the past 6 months, nightly insomnia, a sense of fatigue or loss of energy almost every day, feelings of worthlessness and diminished ability to concentrate and/or focus his attention on any type of cognitive task for extended periods of time. As to Plaintiff's treatment, Dr. Ramm listed his prescribed medications and noted that he was seen for outpatient therapy every other week. Finally, Dr. Ramm described Plaintiff's prognosis with regard to his ability to return to work on a full-time basis as undetermined at that time. (Docket No. 29, ¶ 27, Exh. 1, AR 62-63, Docket No. 33, ¶ 27).

On November 24, 2009, a telephone interview of Plaintiff was conducted by Charlotte Graham, the Sedgwick Claim Manager assigned to his claim for LTD benefits,[22] while Plaintiff was at

---

of Mental Disorders, Fourth Edition, Text Revision (2000), at 34 (bold face in original).
[22] Docket No. 29, Exh. 1, AR 17.

the office of his counsel. Ms. Graham made the following notes

of the interview:

> "Clmt reports being advised by pcp, Dr Gibson[,] to stop
> working due to his anxiety.[23]  Clmt reports being depressed,
> unable to sleep and IBS. His meds included maxalt,
> wellbutrin, zanax (sic) and Zoloft. He reported no
> physical problems.
> Treating physician: Dr. Gibson, pcp [-] clmt indicated he
> was not seeing any other physician
> Clmt is single living with his partner w/o dependents
> Offset: No SDI, No SSDI, No WC[,] No wage replacement[,]
> clmt advised to file for SSDI per plan requirement
> R/L: clmt states his mother help (sic) and partner helped
> with housework, laundry and meals. He continued to drive.
> ADL: no problems with dressing, bathing or feeding himself"

(Docket No. 29, Exh. 1, AR 12-13).

By letter dated December 11, 2009, Ms. Graham notified

counsel that Plaintiff's claim for LTD benefits was denied.

After summarizing the medical evidence submitted by Drs. Gibson

and Ramm, Ms. Graham stated: "Although your client may have

required medical treatment, the medical information on file does

not provide evidence of disability so severe as to prevent him

from working as a Reconcilement Reporting Analyst II as defined

_____

[23] The Plan contends Plaintiff's representation that Dr. Gibson advised him to
stop working due to his anxiety is inconsistent with Dr. Gibson's records
"which do not contain such a recommendation." (Docket No. 29, ¶ 35). In
response, Plaintiff denies any alleged inconsistency noting the Treating
Physician's Statement completed on May 18, 2009 in which Dr. Gibson
indicated, among other things, that Plaintiff was limited/restricted from
performing the essential functions of his job with PNC due to overwhelming
anxiety, migraine headaches, insomnia and IBS; that Plaintiff had not been
released to return to work without restriction/limitation; and that he did
not know when Plaintiff could be released to full or part-time work. (Docket
No. 33, ¶ 35, Docket No. 29, Exh. 1, AR 33-35). The Court agrees with
Plaintiff that Dr. Gibson's failure to document in office notes his advice to
Plaintiff to stop working due to anxiety does not give rise to an
inconsistency in light of the other evidence submitted by Dr. Gibson in
support of Plaintiff's LTD claim.

by the definition of disability during the entire 90 day elimination period and beyond. Therefore, Mr. Boby's claim for [LTD] has been denied and closed accordingly." (Docket No. 29, Exh. 1, AR 171-73).

On December 30, 2009, counsel wrote to Ms. Graham requesting Plaintiff's updated claim file "so that we may have a complete administrative record prior to deciding whether or not to file suit in this case." Plaintiff's complete LTD file was sent to counsel on January 19, 2010. (Docket No. 29, Exh. 1, AR 174-75).

By letter dated May 19, 2010, counsel filed a formal appeal of the denial of Plaintiff's LTD claim with Sedgwick, enclosing answers to counsel's interrogatories by Dr. Gibson and a Treating Medical Source Statement completed by Dr. Ramm. Michael Middleton, a Sedgwick Appeals Specialist, acknowledged receipt of Plaintiff's appeal on June 1, 2010. (Docket No. 29, Exh. 1, AR 176, 186).

In the answers to interrogatories submitted in support of Plaintiff's appeal of the denial of his claim for LTD benefits which were provided on February 9, 2010, Dr. Gibson stated that he had been treating Plaintiff since March 2005; Plaintiff's diagnoses include anxiety disorder, IBS, migraine headaches and insomnia; Plaintiff's complaints "are legitimate and compatible with his office visits;" and Plaintiff's diagnosis of IBS, which

is compounded by the other diagnoses, would prevent him from working a normal workday.[24]   (Docket No. 29, Exh. 1, AR 178-79).

In the Treating Medical Source Statement submitted to Sedgwick in support of Plaintiff's appeal, Dr. Ramm noted that he began treating Plaintiff on August 22, 2008; Plaintiff's clinical syndrome (Axis I) is anxiety disorder; Plaintiff has no developmental or personality disorder (Axis II); Plaintiff's physical conditions (Axis III) include IBS and migraine headaches; Plaintiff's signs and symptoms include poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, intrusive recollections of traumatic experience and generalized persistent anxiety; Plaintiff was consistent in his presentation and Dr. Ramm believed he was being truthful regarding his complaints; on average, Dr. Ramm anticipated Plaintiff would be absent from work more than 3 times a month; Plaintiff's work-related limitations in light of his impairments include difficulty concentrating, following

_____

[24] Dr. Gibson's last answer was in response to the following interrogatory: "4. Would you agree that Mr. Boby's diagnosis of irritable bowel syndrome would prevent him from working a normal workday wherein he would be required to be at his work station working 52 minutes out of every hour with only 2 scheduled breaks and 1 scheduled lunch break, or, in other words, would his need to use the restroom cause him to be off task in any occupation more than 10% of the workday?"  (Docket No. 29, Exh. 1, AR 179).

directions and multi-tasking; Plaintiff's ability to perform the following work-related activities was "fair:"[25] (1) remember work-like procedures, (2) maintain attention for two-hour segments, (3) maintain regular attendance and be punctual within the usual tolerances, (4) sustain an ordinary routine without special supervision, (5) work in coordination with or proximity to others without being unduly distracted, (6) accept instructions and respond appropriately to criticism from supervisors, (7) respond appropriately to changes in a routine work setting, (8) deal with normal work stress, (9) deal with the stress of semiskilled or skilled work, (10) travel in unfamiliar places, and (11) use public transportation; Plaintiff's ability to perform the following work-related activities was "poor or none:"[26] (1) complete a normal workday and workweek without interruptions from psychologically based symptoms, (2) perform at a consistent pace without an unreasonable number and length of rest periods, and (3) understand and remember detailed instructions; Plaintiff's social skills were fairly impaired causing him to avoid interactions with others as evidenced by a T-score of 80 on the

---

[25] "Fair" means the "[a]bility to function in this area is seriously limited, but not precluded." (Docket No. 29, Exh. 1, AR 183).
[26] "Poor or none" means "[n]o useful ability to function in this area." (Docket No. 29, Exh. 1, AR 183).

Si scale of the MMPI-II;[27] and it was a reasonable conclusion

that a person with Plaintiff's condition would experience

difficulty working 8 hours a day, 5 days a week. (Docket No.

29, Exh. 1, AR 180-85).

On June 7, 2010, Mr. Middleton contacted Plaintiff's

counsel to determine whether all of the medical evidence

supporting Plaintiff's appeal of the denial of his LTD claim had

been submitted. Upon confirmation that all medical evidence had

been submitted, Sedgwick initiated the appeal processing.

(Docket No. 29, Exh. 1, AR 6-7).

On June 9, 2010, Mr. Middleton referred Plaintiff's file to

Network Medical Review ("NMR") with a request to arrange reviews

of Plaintiff's file by specialists in family medicine and

psychiatry. The purpose of the reviews was to obtain opinions

regarding Plaintiff's ability to carry out the duties of an RRA

II during the period in question. In turn, NMR referred

Plaintiff's file to Insurance Appeals, Ltd. to schedule the

---

[27] The MMPI, or Minnesota Multiphasic Personality Inventory, is one of the most
frequently used personality tests in mental health. In 1989, the MMPI became
the MMPI-II as a result of a major restandardization project that was
undertaken to develop an entirely new set of normative data representing
current population characteristics. The MMPI-II includes 10 Clinical Scales
that measure common diagnoses. Raw scores on the scales are transformed into
a standardized metric known as T-scores making interpretation easier for
clinicians. A mean or average T-score equals 50 and the standard deviation
is 10. Clinical Scale 0, also known as the Si or Social Introversion Scale,
measures whether people enjoy and are comfortable being around other people.
http://en.wikipedia.org. Due to new norms for the MMPI-II, a T-score of 65
is significant. A score above 70 on the Si scale indicates the testee is
withdrawn. http://schatz.sju.edu/psycheval.

reviews. (Docket No. 29, Exh. 1, AR 6, 187-91, 200). Dr. Glenn Hamilton, a Board-certified family practitioner, and Dr. Marcus J. Goldman, a Board-certified psychiatrist, performed the requested reviews. Both physicians filed their reports on June 16, 2010.[28] (Docket No. 29, Exh. 1, AR 192-99).

After summarizing the medical and psychological evidence in Plaintiff's claim file, Dr. Hamilton, the family practitioner, rendered the opinion that Plaintiff was not disabled during the relevant time period. Noting that Plaintiff complained of headaches and abdominal discomfort, Dr. Hamilton stated there were no objective or clinical findings to support a finding that Plaintiff could not perform the job of an RRA II. With respect to clinical findings, Dr. Hamilton noted that none of Dr. Gibson's physical examinations of Plaintiff showed any significant abdominal pain, tenderness, rebound, rigidity, guarding or distention. As to objective findings, Dr. Hamilton noted that there were no imaging findings to substantiate any abnormalities of the GI system or any neurological deficits on physical examination. In addition, there were no MRI, EMG, x-ray or other imaging studies of the head or brain demonstrating

---

[28] The reports of both physician reviewers indicate the following documents, among others, were provided to them for review: claim log (case notes 11/9/09-6/9/10); progress notes of Dr. Gibson (7/15/08-2/9/10); progress notes of Dr. Ramm (8/22/08-2/23/10 + undated); lab reports from Dr. Gibson (2/7/09-2/28/09); and other test reports from Dr. Gibson (2/27/09-3/30/09). (Docket No. 29, Exh. 1, AR 192, 196). The Court notes that Plaintiff disputes, without offering any supporting evidence, the Plan's representation that his entire file was sent to NMR. (Docket No. 33, ¶ 48).

any significant abnormality related to headaches or IBS. In conclusion, Dr. Hamilton stated:[29]

> "Based on the examination data reviewed, the condition is of a mild nature and the period of time off work far exceeds the usual amount of work loss expected for this condition. The findings do not support an inability for Mr. Boby to perform his regular unrestricted occupation as of 07/07/08 to present. Specifically, documentation notes that the irritable bowel syndrome and migraine headaches are not the basis for the patient's claim of disability, but that the psychiatric conditions including anxiety and depression are the diagnoses reportedly responsible for the disability. Therefore, I will defer to the psychiatric evaluation for discussion of those diagnoses. However, from a family practice standpoint, the employee is not disabled from the ability to perform his regular unrestricted occupation as of 07/07/08 to the present."

(Docket No. 29, Exh. 1, AR 196-99).

After summarizing the medical and psychological evidence in Plaintiff's claim file, Dr. Goldman, the psychiatrist, also rendered the opinion that Plaintiff was not disabled during the relevant time period. In support of his opinion, Dr. Goldman noted that the evidence pertaining to Plaintiff's mental impairments was very limited. The therapy notes of Dr. Ramm were brief, cursory and lacked findings of a mental status examination. Moreover, Plaintiff was not seen "particularly

---

[29] Prior to rendering his opinion concerning Plaintiff's claim of disability, Dr. Hamilton contacted Dr. Gibson's office on two occasions to schedule a conference call. On both occasions, Dr. Gibson's answering machine picked up the calls and Dr. Hamilton left a voice message requesting a return call. Dr. Gibson, however, failed to return Dr. Hamilton's calls. (Docket No. 29, Exh. 1, AR 196).

frequently" and the information was totally subjective and self-reported. In conclusion, Dr. Goldman stated:[30]

> "The data also suggests a variety of life circumstances and legal issues and complaints, none of which would objectively or in any compelling or convincing fashion support disability. Mr. Boby is not noted to be acutely or actively suicidal, homicidal, psychotic, manic, aggressive, vegetative, volatile, obtunded, lethargic, or with altered sensorium or quantified cognitive dysfunction. There are no data that support impairments in activities of daily living or independent activities of daily living as a result of a mental condition. Mr. Boby does not require treatment in more intense levels of care. It is unknown precisely how Mr. Boby spends his time between appointments, but the data do not support loss of global functioning as a result of a mental condition. Mr. Boby presents with a variety of complaints that simply do not rise to the level of functional incapacity, and do not support the presence of a disabling mental condition. Therefore from a psychiatric standpoint, the employee is not disabled from the ability to perform his regular unrestricted occupation as of 07/07/08 to present."

(Docket No. 29, Exh. 1, AR 192-95).

By letter dated July 6, 2010, Mr. Middleton notified Plaintiff's counsel that appellate review of the denial of Plaintiff's LTD claim had been completed and the adverse decision upheld due to the lack of medical evidence supporting Total Disability. The letter advised counsel of Plaintiff's right to file a civil suit under ERISA if he disagreed with the decision.[31] (Docket No. 29, Exh. 1, AR 201-03).

---

[30] Prior to rendering an opinion, Dr. Goldman attempted on 2 occasions to schedule a conference call with Plaintiff's treating psychologist, Dr. Ramm, and was compelled to leave voice messages. Dr. Ramm failed to return Dr. Goldman's calls. (Docket No. 29, Exh. 1, AR 192).

[31] On July 6, 2010, the same day the letter notifying counsel that the adverse decision on Plaintiff's LTD claim had been upheld was sent, counsel sent a

31

**STANDARD FOR SUMMARY JUDGMENT**

Under Rule 56(a) of the Federal Rules of Civil Procedure,

"[t]he court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Celotex

Corp. v. Catrett, 477 U.S. 317, 332 (1986).[32] A fact is

"material" if proof of its existence or non-existence might

affect the outcome of the litigation, and a dispute is "genuine"

if the evidence is such that a reasonable jury could return a

verdict for the non-moving party. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). In performing this analysis,

the court views the facts in the light most favorable to the

non-moving party. "After making all reasonable inferences in

---

letter to Mr. Middleton concerning Plaintiff's pending appeal to inform him
that Plaintiff had been awarded disability benefits by the Social Security
Administration without a hearing. Counsel stated, among other things: "We
feel that this is very important information, as very few individuals,
especially individuals of Mr. Boby's age, are awarded Social Security
Disability benefits upon application. The denial rates in our area are
approaching 80 percent and we feel that this strongly supports a
determination that Mr. Boby is disabled under the terms of the long term
disability policy." (Docket No. 29, Exh. 1, AR 210). In this connection,
the Court notes that when reviewing a decision of a plan administrator under
ERISA, a court may only consider the evidence that was before the plan
administrator at the time the decision was rendered. See Luby v. Teamsters
Health, Welfare and Pension Trust Funds, 944 F.2d 1176, 1184 n.8 (3d Cir.
1991). Therefore, the award of SSI benefits to Plaintiff may not be
considered by the Court in determining whether Sedgwick's decision to deny
Plaintiff's claim for LTD benefits was arbitrary and capricious.

[32] Amendments to Fed.R.Civ.P. 56 became effective on December 1, 2010. The
frequently cited standard for summary judgment is now set forth in Rule
56(a), rather than Rule 56(c). Although the wording of the standard has
changed slightly, i.e., the word "issue" was replaced with the word
"dispute," the change does not affect the substantive standard or the
applicability of prior decisions construing the standard. Fed.R.Civ.p. 56
Advisory Committee Notes.

the nonmoving party's favor, there is a genuine issue of
material fact if a reasonable jury could find for the nonmoving
party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265,
268 (3d Cir.2010), citing, Reliance Ins. Co. v. Moessner, 121
F.3d 895, 900 (3d Cir.1997).

**DISCUSSION**

It is well established that where an employee benefit plan
governed by ERISA grants discretionary authority to the plan
administrator to determine eligibility for benefits under the
plan, as in this case, a court reviewing an eligibility
determination by the plan administrator applies the arbitrary
and capricious standard of review. See DeWitt v. Penn-Del
Directory Corp., 106 F.3d 514, 520 (3d Cir.1997), citing,
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-12
(1989).

"Under the arbitrary and capricious (or abuse of
discretion) standard of review, the district court may overturn
an eligibility decision of the plan administrator only if it is
'without reason, unsupported by substantial evidence or
erroneous as a matter of law.'" Abnathya v. Hoffman-La Roche,
Inc., 2 F.3d 40, 45 (3d Cir.1993), quoting, Adamo v. Anchor
Hocking Corp., 720 F.Supp. 491, 500 (W.D.Pa.1989). See also
Gaines v. Amalgamated Ins. Fund, 753 F.2d 288, 289 (3d Cir.
1985)("A plan interpretation should be upheld even if the court

33

disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan...."); Ellis v. Hartford Life and Accident Ins. Co., 594 F.Supp.2d 564, 566 (E.D.Pa.2009)(A court applying an arbitrary and capricious standard of review is "not free to substitute its judgment for that of the administrator.").

The question of whether a plan administrator's denial of benefits under an employee benefit plan subject to ERISA was arbitrary and capricious is routinely decided on a motion or cross-motions for summary judgment. See, e.g., The Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003); Stratton v. E.I. Dupont De Nemours & Co., 363 F.3d 250 (3d Cir.2004); Gillis v. Hoeschst Celanese Corp., 4 F.3d 1137 (3d Cir.1993); Balas v. The PNC Financial Services Group, Inc. and Affiliates Long Term Disability Plan, CA No. 10-249, 2012 WL 681711 (W.D.Pa. Feb. 29, 2012); Brown v. First Reliance Standard Life Ins. Co., CA No. 10-486, 2011 WL 1044664 (W.D.Pa. Mar. 18, 2011).

**Exhaustion of Administration Remedies**

Initially, the Plan asserts that it is entitled to judgment as a matter of law on Plaintiff's ERISA claim because he failed to exhaust administrative remedies. Specifically, it is argued: "The Plan required Plaintiff to submit a claim for LTD benefits to Sedgwick *no later than 90 days following the date that his alleged Total Disability began*, or by October 5, 2008 (or 90

34

days from the alleged date of Total Disability - July 7,

2008).... The Plan explicitly states that if Plaintiff fails to

submit a timely claim, 'such claim or request shall be waived,

and the Participant will be forever barred from reasserting' and

'institut[ing]' 'legal action' with respect to such claim."

(Docket No. 30, p. 8).

With respect to exhaustion of administrative remedies in

ERISA cases, in Metropolitan Life Ins. Co. v. Price, 501 F.3d

271 (3d Cir.2007), the Court of Appeals for the Third Circuit

stated in relevant part:

\*   \*   \*

Informed by the Supreme Court's instruction, we must
assess whether ERISA's exhaustion doctrine is a
"jurisdictional" mandate. Certainly, it is an important
legal rule. We have recognized that requiring exhaustion
of plan remedies helps to "'reduce the number of frivolous
lawsuits under ERISA; to promote the consistent treatment
of claims for benefits; to provide a nonadversarial method
of claim settlement; and to minimize the costs of claims
settlement for all concerned.'" Harrow, 279 F.3d at 249
(quoting Amato v. Bernard, 618 F.2d 559, 567 (9th Cir.
1980)). In addition, exhaustion enhances the ability of
fiduciaries "'to expertly and efficiently manage their
funds by preventing premature judicial intervention in
their decision-making processes.'" Id. (quoting Amato, 618
F.2d at 567). It also has the salutary effect of "refining
and defining the problem" for final judicial resolution.
Amato, 618 F.2d at 568.

But as important as the rule may be, "ERISA nowhere
mentions the exhaustion doctrine." Id. at 566. It is a
judicial innovation fashioned with an eye toward "sound
policy." Id. at 567. We have not required exhaustion
where the claim seeks to enforce a statutory right under
ERISA. Zipf v. AT&T, 799 F.2d 889, 891-92 (3d Cir.1986).
In addition, the failure to exhaust will be excused in

cases where a fact-sensitive balancing of factors reveals that exhaustion would be futile.  See Harrow, 279 F.3d at 249-50.

This is not the stuff of a jurisdictional rule. Congress has expressly provided for jurisdiction over ERISA cases in 29 U.S.C. § 1132(e).  Neither that provision nor any other part of ERISA contains an exhaustion requirement. Thus, as a judicially-crafted doctrine, exhaustion places no limits on a court's adjudicatory power.  See Arbaugh, 126 S.Ct. at 1245; Kontrick, 540 U.S. at 452, 124 S.Ct. 906; see also Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 445 (2d Cir.2006)("[ERISA exhaustion] is purely a judge-made concept that developed in the absence of statutory language demonstrating that Congress intended to make [it] a jurisdictional requirement."); Chailland v. Brown & Root, Inc., 45 F.3d 947, 950 n.6 (5th Cir.1995) (same).

Furthermore, even aside from the Supreme Court's instruction, our own cases carefully distinguish "between prudential exhaustion and jurisdictional exhaustion." Wilson v. MVM, Inc., 475 F.3d 166, 174 (3d Cir.2007); see also Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).  Prudential exhaustion "is generally judicially created."  Wilson, 475 F.3d at 174.  It reflects a judicial desire to "respect[] agency autonomy by allowing it to correct its own errors." Id.  Unlike a rigid jurisdictional rule, prudential exhaustion provides flexible exceptions for "waiver, estoppel, tolling or futility."  Id.  ERISA's exhaustion requirement bears all the hallmarks of a nonjurisdictional prudential rule.  In addition to being judge-made, the doctrine's futility exception involves a discretionary balancing of interests.  Judicial prudence, not power, governs its application in a given case.

\*    \*    \*

501 F.3d at 278-79.

See also Paese v. Hartford Life and Accident Inc. Co., 449 F.3d 435 (2d Cir.2006)(Policy favoring exhaustion of administrative remedies in ERISA cases is non-jurisdictional; thus, claimant's

failure to exhaust does not deprive court of subject matter

jurisdiction to hear claim for benefits under Act's civil

enforcement provision, but rather constitutes affirmative

defense subject to waiver, estoppel, futility and similar

equitable considerations).

Simply put, in light of Sedgwick's action in processing

Plaintiff's LTD claim and appeal from the denial of such claim

despite the fact the LTD claim clearly was not filed within the

time limits set forth in the Plan, the Court finds that the Plan

has waived the timeliness issue.[33]

---

[33] With regard to the ERISA cases cited by the Plan to support its timeliness
argument, the facts presented in those cases are distinguishable from the
instant case. (Docket No. 30, pp. 8-10, Docket No. 35, pp. 5-6). In Harrow
v. Prudential Ins. Co. of America, 279 F.3d 244 (3d Cir.2002), the plaintiffs
took no steps to challenge a plan's denial of prescription insurance coverage
beyond an initial telephonic inquiry. As a result, in their subsequent ERISA
case, the Court of appeals for the Third Circuit found that the plaintiffs
did not qualify for the futility exception to the administrative exhaustion
requirement and affirmed the district court's entry of summary judgment in
favor of the plan. In Harding v. Provident Life & Accid. Ins. Co., 809
F.Supp.2d 403 (W.D.Pa.2011), the district court entered summary judgment in
favor of a plan in an ERISA action due to a lack of evidence that the
plaintiff had pursued an appeal from the plan's denial of her claim for
disability benefits. In Cornejo v. Horizon Blue Cross/Blue Shield of New
Jersey, Civil Action No. 11-7018, 2012 WL 715553 (D.N.J. Mar. 5, 2012), the
plaintiff failed to appeal a Plan's denial of coverage for medical expenses
despite notification of her right to do so. Under the circumstances, the
district court held that plaintiff's ERISA action was barred for failure to
exhaust administrative remedies. In Wolfe v. Lu, Civil Action No. 06-79,
2007 WL 1007181 (W.D.Pa. Mar. 30, 2007), a plaintiff whose claim for
retirement benefits had been denied filed an ERISA action against the plan.
The plan's motion to dismiss was denied by the district court as premature
based on the limited record before the court. It appeared that neither the
plaintiff nor the plan administrator had followed the letter of the plan as
to exhaustion of administrative remedies. Moreover, the plaintiff alleged
that he failed to receive plan documents outlining the administrative process
until after the period in which to file an appeal had passed. In Garland v.
USAirways, Inc., Civil Action No. 05-140, 2007 WL 921980 (W.D.Pa. Mar. 14,
2007), a plan's motion to dismiss an ERISA claim was granted because the pro
se plaintiff had not pursued administrative remedies with respect to the
plan's denial of his claim for pension benefits prior to filing the lawsuit.

Further, as noted by Plaintiff, under Section 503 of ERISA, "every employee benefit plan shall (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."[34] 29 U.S.C. § 1133(1). In the letter denying Plaintiff's claim for LTD benefits, as well as the letter upholding that decision on appeal, Sedgwick did not identify Plaintiff's failure to file his LTD claim within the time period specified in the Plan as a basis for the adverse decisions. Rather, the sole basis for the adverse decisions was

---

In Shamoun v. Board of Trustees, Liquor Salesmen's Union Local 2 Pension Fund, 357 F.Supp.2d 598 (E.D.N.Y.2005), the plaintiff brought an ERISA action against a plan administrator claiming entitlement to retirement benefits. The district court granted the plan's motion to dismiss based on the plaintiff's failure to exhaust his administrative remedies, holding that an assertion by the president of the local union, a member of the benefits committee, that the plaintiff was not entitled to retirement benefits from the pension fund while he continued to work did not constitute a formal denial of benefits or clear and positive showing of the futility exception to the ERISA exhaustion requirement. In Laird v. Norton Healthcare, Inc., 442 Fed.Appx. 194 (6th Cir.2011), the Court of Appeals for the Sixth Circuit granted a plan's motion for summary judgment in an ERISA case challenging the denial of the plaintiff's claims for STD and LTD benefits because the plaintiff's available administrative avenues for relief were not so obviously dead ends that they were not worth pursuing at all. Thus, the futility exception to the ERISA exhaustion requirement did not apply. Finally, in Cigna Corp. v. Amara, __ U.S. __, 131 S.Ct. 1866 (2011), the Supreme Court granted certiorari to determine whether the provision of ERISA authorizing recovery of amounts due under a ERISA plan gave the district court authority to reform the terms of the plan as a remedy, and concluded that it did not. Cigna did not address the issue of exhaustion of administrative remedies by an ERISA plan beneficiary or the waiver of such requirement by a plan. In sum, none of the foregoing cases involved the disposition by a plan of a claim for benefits governed by ERISA and the processing of an appeal from the denial of such benefits, despite the untimeliness of the claim in the first instance.

[34] This requirement of ERISA is explicitly set forth in Sections 7(a) and 7(b) of the Plan. (Docket No. 29, Exh. 1, AR 229).

the absence of medical evidence supporting Plaintiff's claim of "Total Disability" as defined in the Plan.

Under the circumstances, the Court declines to hold that the Plan is entitled to summary judgment because Plaintiff's application for LTD benefits was not filed within the time specified in the Plan. See Ketterman v. Affiliates Long-Term Disability Plan, 2009 WL 3055309, at **10-11 (W.D.Pa. Sept. 21, 2009)(quoting Skretvedt v. E.I. Dupont De Nemours and Co., 268 F.3d 167, 177 n.8 (3d Cir.2001), abrogated on other grounds, The Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)("It would be problematic, to say the least, to 'recognize an administrator's discretion to interpret a plan by applying a deferential 'arbitrary and capricious' standard of review, yet ... allow the administrator to 'shore up' a decision after-the-fact by [providing] the 'true' basis for the decision after the matter is in litigation.'").

**Sufficiency of the Medical Evidence**

Alternatively, the Plan asserts that it is entitled to summary judgment on Plaintiff's ERISA claim because Sedgwick's denial of his claim for LTD benefits was not arbitrary and capricious; rather, the decision was rational in light of the administrative record in this case. In response, Plaintiff contends that the decision denying LTD benefits was arbitrary and capricious because (a) the limitations and restrictions

placed upon him by Drs. Gibson and Ramm establish his inability to perform the essential duties of the skilled and highly demanding job of an RRA-II; and (b) the paper reviews conducted by the independent medical experts, Drs. Goldman and Hamilton, were flawed in various respects. After consideration, the Court finds Plaintiff's arguments unpersuasive.

**Evidence Submitted from Dr. Gibson and Doug Ramm, Ph.D.**

In opposing the Plan's motion for summary judgment, Plaintiff notes that his subjective complaints were found credible by Dr. Gibson, and that Dr. Gibson rendered the opinion he would be off task more than 10% of the workday due to his IBS. With respect to Dr. Gibson's credibility determination, the Court notes that Sedgwick did not reject Dr. Gibson's diagnoses based on Plaintiff's subjective complaints. Rather, Sedgwick concluded that the limitations resulting from those diagnoses were not sufficiently severe to preclude Plaintiff from performing his job as an RRA-II.

As to Dr. Gibson's opinion that Plaintiff would be off task 10% of the workday due to his IBS, which was rendered on February 9, 2010 in response to interrogatories submitted to the doctor by counsel (Docket No. 29, Exh. 1, AR 179), the Court notes that an earlier Treating Physician Statement by Dr. Gibson, as well as his office notes predating the February 9, 2010 opinion, do not support such a limitation. Specifically,

Dr. Gibson's office notes dated July 15, 2008 and August 25, 2008 indicate that Plaintiff's IBS was resolved as of February 8, 2008 (Docket No. 29, Exh. 1, AR 82, 86); in the Statement of Attending Physician completed by Dr. Gibson on August 25, 2008 in connection with Plaintiff's claim for STD benefits, Dr. Gibson did not include IBS among Plaintiff's diagnoses (Docket No. 29, Exh. 2, p. 6); Dr. Gibson's office notes dated September 23, 2008 indicate that Plaintiff's IBS was stable (Docket No. 29, Exh. 1, AR 88); and Dr. Gibson's office notes dated December 17, 2008 indicate that Plaintiff denied abdominal complaints and difficulty with bowel movements, his bowel sounds were good and the doctor's assessment noted a "history of [IBS]" (Docket No. 29, Exh. 1, AR 91-92).

The Court also notes Plaintiff's apparent recognition of the dearth of evidence supporting Dr. Gibson's opinion that he would be off task 10% of the workday due to IBS. Although Plaintiff mentions the opinion in the brief filed in opposition to the Plan's motion for summary judgment, he goes on to state: "Dr. Gibson does not opine further as to Boby's restrictions, as he is merely Boby's treating primary care physician; however Doug Ramm, Ph.D., the treating psychologist's findings and restrictions on Mr. Boby are much more extensive than those of Dr. Gibson, as he is a specialist and Mr. Boby's psychological

symptoms are clearly at the heart of his disability." (Docket
No. 31, p. 14).

Turning to Plaintiff's objection to Sedgwick's failure to
accept the opinions rendered by Dr. Ramm concerning the
limitations on his work-related mental abilities, "courts have
no warrant to require administrators automatically to accord
special weight to the opinions of a claimant's physician; nor
may courts impose on plan administrators a discrete burden of
explanation when they credit reliable evidence that conflicts
with a treating physician's evaluation." The Black & Decker
Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

In this case, Sedgwick reasonably relied on the report of
Dr. Goldman, the reviewing psychiatrist, in rejecting Dr. Ramm's
opinions. As noted by Dr. Goldman (and Sedgwick in the letter
upholding the decision to deny Plaintiff's claim for LTD
benefits), Dr. Ramm's therapy notes were brief and cursory and
based entirely on Plaintiff's subjective statements; Plaintiff
was not seen on a particularly frequent basis; the matters
discussed during Plaintiff's therapy sessions, i.e., a variety
of life circumstances and legal issues and complaints, did not
support a claim of total disability; Plaintiff was never
described as "suicidal, homicidal, psychotic, manic, aggressive,
vegetative, volatile, obtunded, lethargic, or with altered
sensorium or quantified cognitive dysfunction;" and Dr. Ramm's

therapy notes do not mention impairments in Plaintiff's activities of daily living.[35] (Docket No. 29, Exh. 1, AR194-95, 202).

As to the GAF score of 50 assigned to Plaintiff by Dr. Ramm in the report submitted to Sedgwick on November 13, 2009, a GAF score pertains to a particular date and is not necessarily indicative of an individual's functioning on other dates during the relevant time period. See, e.g., Bair v. Life Ins. Co. of North America, No. 09-cv-00549, 2011 WL 4860006, at *18 (E.D.Pa. Oct. 13, 2011). Thus, this single GAF score in the administrative record, which is not supported by any actual findings, does not render Sedgwick's failure to adopt Dr. Ramm's opinions arbitrary and capricious.

Similarly, Dr. Ramm's cursory reference in the Medical Source Statement completed on February 23, 2010 to Plaintiff's "fairly impaired social skills and "tend[ency] to attempt to avoid interations (sic) with others" as evidenced by his T-score of 80 on the MMPI-II Si Scale does not render Sedgwick's failure to adopt Dr. Ramm's opinions arbitrary and capricious. Dr. Ramm's therapy notes do reflect complaints by Plaintiff of impaired social skills. Moreover, the opinions rendered by Dr.

_____

[35] Plaintiff also emphasizes the skilled nature of his job as an RRA-II. In this connection, the Court notes that Dr. Ramm opined that Plaintiff was seriously limited in, **but not precluded from**, dealing with the stress of semiskilled and skilled work. (Docket No. 29, Exh. 1, AR 184).

Ramm in his Medical Source Statement contradict the results of
the MMPI-II in this regard. Specifically, Dr. Ramm opined that
Plaintiff's abilities in the following areas were "Good": (1)
Get along with co-workers or peers without unduly distracting
them or exhibiting behavioral extremes; (2) Maintain socially
appropriate behavior; and (3) Interact appropriately with the
general public. Finally, the Court notes that that the ability
of tests like the MMPI to predict future behavior and
capacities, such as the ability to work, is a matter of serious
controversy in the courts and in the sciences. Davis v.
Broadspire Services, Inc., Civil Action No. 05-5829, 2006 WL
3486464, at *7 (E.D.Pa. Dec. 1, 2006).

**Adequacy of the Reviews Conducted by Drs. Hamilton and Goldman**

i

Plaintiff contends that the reviews of his LTD claim by
Drs. Hamilton and Goldman were flawed because they "never
conducted an analysis of [his] ability to perform his job in
light of the medical diagnoses." In support of this argument,
Plaintiff cites Miller v. American Airlines, Inc., 632 F.3d 837
(3d Cir. 2011). (Docket No. 31, pp. 18-20).

In Miller, the plaintiff was a commercial airline pilot
with American Airlines Inc. ("American"), who suffered a
psychotic episode in August 1998 while on duty. Miller was
admitted to the hospital; he was prescribed various medications;

and his FAA medical certification, required for all commercial

pilots, was revoked. In November 1999, American awarded LTD

benefits to Miller. Seven years later, Miller received a letter

from American notifying him that his LTD benefits were

terminated.

Miller appealed the termination of his LTD benefits without

success. He then filed a complaint against American alleging a

violation of ERISA. The district court granted American's

motion for summary judgment concluding that the termination of

Miller's LTD benefits was not arbitrary and capricious. On

appeal, Miller argued that American's decision to terminate his

LTD benefits was arbitrary and capricious because, among other

things, neither the termination letter nor the report of the

reviewing physician provided an explanation of how he could

perform the essential duties of his job as a commercial airline

pilot in light of his diagnosis. In agreeing with this

argument, the Court of Appeals for the Third Circuit stated:

\* \* \*

   On the whole, we believe that [the reviewing
physician's] conclusion that Miller could perform as a
pilot, without explaining how his claimed anxiety and
latent risk of psychosis would be compatible with this
uniquely stressful position, is perfunctory. Accordingly,
American's failure to address the specific demands that
Miller would face as a pilot suggests that the termination
decision was not reasoned and based on an individualized
assessment of Miller's ability. Thus, this is a
significant oversight that suggests the decision was
arbitrary and capricious....

\*    \*    \*

632 F.3d at 855.

After consideration, the Court concludes that Miller does
not dictate a finding that Sedgwick's reliance on the opinions
rendered by Drs. Hamilton and Goldman was arbitrary and
capricious. There is no indication that, standing alone, the
failure to explain in detail how Miller's diagnosis would allow
him to perform the essential duties of his job as a pilot would
have resulted in the reversal of the district court's summary
judgment in favor of American. In reversing the district
court's decision, the Court of Appeals for the Third Circuit
also noted the following problems with American's termination
decision: (a) American's initial decision to award LTD benefits
to Miller was reversed without the receipt of supporting
information that differed in any material way from the
information relied upon to award LTD benefits; (b) Miller's
failure to obtain his FAA medical certification, which was not
required by the employee benefit plan, was considered by
American in terminating his LTD benefits; (c) American failed to
comply with ERISA's notice requirements in terminating Miller's
LTD benefits; and (d) a conflict of interest existed because
American had an incentive to deny Miller's LTD benefits. In the
present case, none of these other factors are present, and,

unlike the position held by Miller, Plaintiff's position with PNC, while skilled, cannot be described as uniquely stressful and there is no evidence that Plaintiff has ever experienced a psychotic episode.

In sum, there is no dispute that Plaintiff's job description was provided by Sedgwick to Drs. Goldman and Hamilton to consider in reviewing Plaintiff's claim of total disability, and both reviewing physicians referred to Plaintiff's specific position in their reports. Based on the facts of this case, where there was substantial evidence to support Sedgwick's conclusion that Plaintiff was not totally disabled by his anxiety and depression, the failure of Drs. Goldman and Hamilton to provide a detailed analysis of Plaintiff's diagnoses and their effect on the essential duties of his position with PNC does not warrant a finding that the decision to deny LTD benefits to Plaintiff was arbitrary and capricious.

ii

Plaintiff also asserts that the reviews conducted by Drs. Goldman and Hamilton were flawed because they "required objective evidence of Boby's disabling condition in contravention of the clear language of the Plan." (Docket No. 31, pp. 20-23). Contrary to this argument, as noted by the Plan, Sedgwick did not require Plaintiff to submit objective

evidence of his diagnoses. Rather, Plaintiff was required to

provide Sedgwick with objective evidence of the limitations

resulting from his diagnoses which precluded him from performing

his job as an RRA-II, which is a legitimate requirement. See

Balas v. The PNC Financial Services Group, Inc., No. 2:10cv249,

2012 WL 681711 (W.D.Pa.2012)("[C]ourts within the Third Circuit

have held that is it not an abuse of discretion to require

objective evidence that a condition, including chronic fatigue

syndrome and fibromyalgia, is sufficiently disabling to warrant

an award of LTD benefits."). (Docket No. 35, pp. 13-16).

### iii

Finally, Plaintiff asserts that the reviews conducted by

Drs. Goldman and Hamilton were flawed because Sedgwick did not

provide the physicians with his entire claim file.

Specifically, Plaintiff contends that Drs. Goldman and Hamilton

were not provided with (1) his LTD application, (2) Dr. Gibson's

November 11, 2009 response to questions posed by Sedgwick, and

(3) the correspondence from Plaintiff's counsel informing

Sedgwick that Plaintiff had been awarded Social Security

disability benefits. (Docket No. 31, pp. 23-24).

As to Plaintiff's initial application for LTD benefits, a

review of the reports of Drs. Goldman and Hamilton show that

they were provided with a document identified as "ROI" dated May

22, 2009. The Court's review of the administrative record

reveals only one document dated May 22, 2009, and that document
is Plaintiff's application for LTD benefits. Moreover, the
report of Dr. Goldman refers to a Treating Physician Statement
of Dr. Gibson dated May 18, 2009, and this is the statement that
was attached to Plaintiff's LTD application. (Docket No. 29,
Exh. 1, AR 27-35). Thus, the evidence supports a finding that
Plaintiff's LTD application was provided to Drs. Goldman and
Hamilton for their review. In any event, the Court's review of
Plaintiff's LTD application and attached Treating Physician
Statement reveals no new information that could have had an
impact on Sedgwick's review of his LTD claim.

Turning to Dr. Gibson's November 11, 2009 response to four
questions posed by Sedgwick, which is alleged to have been
excluded from the documents provided to Drs. Goldman and
Hamilton, the Court notes that Dr. Gibson's responses are
duplicative of information and opinions rendered by the doctor
in other documents that were undisputedly provided to Drs.
Goldman and Hamilton. Like Plaintiff's LTD application, there
is no basis for a finding that the failure to provide this
document to Drs. Goldman and Hamilton for their review could
have changed the adverse decision rendered on Plaintiff's claim
for LTD benefits.

Finally, as to the correspondence from Plaintiff's counsel
regarding his award of Social Security disability benefits, this

correspondence was not received by Sedgwick until after the decision upholding the denial of Plaintiff's claim for LTD benefits. Thus, it could not have been provided to Drs. Goldman and Hamilton in connection with their reviews of Plaintiff's files. Moreover, as noted in footnote 31, because counsel's correspondence was not submitted to Sedgwick before it upheld the adverse decision on Plaintiff's LTD application, it may not be considered in the determination of whether Sedgwick's adverse decision was arbitrary and capricious.

**Conclusion**

For the foregoing reasons, the Court concludes that the decision to deny Plaintiff's application for LTD benefits was not arbitrary and capricious. Accordingly, the Plan's motion for summary judgment will be granted.

_William L. Standish_
William L. Standish
United States District Judge

Date: September 6, 2012